F. L. RYAN, Administrator, Appellant, v. TONY AMODEO, Appellee.

No. 41939.

JULY 18, 1933.

Doran, Boone & Doran and Dyer, Jordan & Dyer, for appellant.

Putnam, Putnam, Langdon & Fillmore and Brunk, Bennett & Janss, for appellee.

DONEGAN, J.—This action arose out of an automobile accident. On April 30, 1930, Francis L. Ryan, the son of F. L. Ryan, the plaintiff-administrator, while driving a Chevrolet truck owned by his father, F. L. Ryan, westward on the Lincoln highway in Boone county, Iowa, was killed as the result of a collision of said truck with a Marmon sedan driven by the defendant, Tony Amodeo. F. L.

Ryan, as administrator of the estate of his deceased son, brought action against the defendant in Polk county, which was the county of his residence. The defendant, Tony Amodeo, filed answer and counterclaim to the petition of plaintiff, and also filed a cross-petition against said F. L. Ryan in his individual capacity, claiming damages because of the alleged negligent operation of the truck driven by the son of said F. L. Ryan with his consent. To this cross-petition said F. L. Ryan, cross-petition defendant, filed a special appearance which was overruled by the court. Thereafter, said F. L. Ryan, cross-petition defendant, filed an alternative motion to strike or for change of venue, which was also overruled by the court. Plaintiff as administrator also filed a joinder in the motion to strike or for change of venue, which was also overruled. Trial was had to a jury, and at the close of plaintiff's evidence the court sustained defendant's motion for a directed verdict in his favor and the petition was dismissed. Four errors are alleged and relied upon by the plaintiff for reversal: That the court erred in overruling the special appearance of the cross-petition defendant, F. L. Ryan; that the court erred in overruling a motion to strike and for change of venue of the cross-petition defendant; that the court erred in overruling the motion of the plaintiff wherein the plaintiff joined in the motion to strike and motion for change of venue filed by the cross-petition defendant; that the court erred in sustaining defendant's motion for a directed verdict. The first three of these alleged errors may be considered together.

I. It appears without dispute that the original notice of the filing of the cross-petition of the defendant, Tony Amodeo, against F. L. Ryan personally, was served upon Ryan in Boone county, Iowa, which is the county of his residence, and no question has been raised as to the form of notice or the manner of service thereof. If the cross-petition was properly filed in this case, and the court had jurisdiction of the subject-matter and of the cross-petition defendant by proper notice thereof, then the special appearance and the motions to strike and for change of venue were properly overruled. We shall direct our attention, therefore, to a consideration of the defendant's right to file such cross-petition in the action brought against him by F. L. Ryan as administrator. Section 11155 of the Code of 1927 is as follows:

" * * * When a defendant has a cause of action affecting the subject matter of the action against a codefendant, or a person

not a party to the action, he may, in the same action, file a cross-petition against the codefendant or other person. The defendants thereto may be notified as in other cases, and defense thereto shall be made in the time and manner prescribed in regard to the original petition, and with the same right of obtaining provisional remedies applicable to the case. The prosecution of the cross-petition shall not delay the trial of the original action, when a judgment can be rendered therein that will not prejudice the rights of the parties to the cross-petition."

It will be noted that this section does not confine a defendant to filing a cross-petition against a codefendant. He has a right to file such cross-petition against a person not a party to the action, provided the cause of action in which such cross-petition is filed affects the subject-matter of the action in which he is defendant. Much confusion prevails among the authorities as to the meaning of the terms "subject of action" and "subject-matter of the action". As said in 1 C. J. 946:

"Many attempts have been made to formulate satisfactory definitions of these terms, but they are not readily susceptible of exact definition and the decisions are widely at variance as to their proper meaning and application."

In Revere Fire Insurance Company v. Chamberlin, 56 Iowa 508, 8 N. W. 338, 339, 9 N. W. 386, this court said:

"The subject of an action is to be distinguished from a cause of action. The subject of an action is the thing or subject-matter to which the litigation pertains. In Bliss on Code Pleading, section 126, the author defines it as 'the matter or thing differing both from the wrong and the relief, in respect to which the controversy has arisen.'"

This, so far as we have been able to discover, is the only pronouncement which this court has made in reference to the meaning of the term "subject-matter of the action". This pronouncement, while making it clear that the subject of an action is to be distinguished from the cause of action and "is the thing or subject-matter to which the litigation pertains," does not give us any light as to how much or how little is included in the term "subject-matter of the action".

Instead of seeking any assistance from the confused and conflicting definitions which have been given to the term "subject-matter of the action", it seems advisable to direct our attention to the purposes of the statute which we are considering, and the construction which has been placed upon it by this court. In Mahaska County State Bank v. Crist, 87 Iowa 415, 54 N. W. 450, 453, plaintiff bank sued upon a promissory note executed by one Crist and one Smith to Springer & Willard. The action was brought by plaintiff in Hamilton county against Crist and Smith and also against Springer & Willard by whom the note had been sold to the bank, but no notice of the action was given to Springer & Willard. Crist and Smith filed a cross-petition against their codefendants, Springer & Willard, and served notice upon them in Mahaska county, which was the county of their residence. Springer & Willard filed an application for change of place of trial to Mahaska county. In construing the statute which we are now considering, this court said:

"The statute contemplates a trial of the issues joined on the cross petition in the court in which the original action is determined. It provides a means for adjudicating in a single action different rights of the defendants and others which are affected by the subject-matter of the litigation which the plaintiff has instituted. The filing of a cross petition and the proceedings thereunder do not constitute a 'separate action', within the meaning of the statute, and to award a party a separate trial in the court of another county, on the ground of his residence therein, would be contrary to its spirit and intent."

Under section 5026 of the Code of 1927, F. L. Ryan, as the owner of the truck driven by his son with his consent, was liable for all damages caused by the negligence of such driver. Every issue involved in the cross-petition of the defendant, Amodeo, against F. L. Ryan in his individual capacity, is also involved in the original action brought by Ryan as administrator against Amodeo. The only facts concerning which evidence would be introduced by the defendant, Amodeo, on his cross-petition, other than those which would be in evidence in the main case, would be his proof that the Chevrolet truck was owned by F. L. Ryan in his individual capacity, and that it was being driven by his son with his consent. In view of the purpose of the statute as set forth in the Mahaska State Bank case, supra, it would seem that, to award the cross-petition defendant Ryan "a separate trial in the court of another county, on the ground of his

residence therein, would be contrary to its spirit and intent". In our opinion, the trial court did not err in overruling the special appearance and the motion to strike and for change of venue of the cross-petition defendant, F. L. Ryan. Likewise, there was no error in overruling the joinder of the plaintiff in the motion to strike and for change of venue of the cross-petition defendant, F. L. Ryan.

II. Appellant's fourth ground of error is based upon the order of the court sustaining defendant's motion for a directed verdict at the close of plaintiff's testimony. Such motion was sustained on the ground that the evidence introduced in behalf of the plaintiff failed to show any negligence on the part of the defendant. Appellant alleges that there is ample evidence in this case to show that at the time of the accident the Marmon sedan driven by the defendant passed to the north of the center of the road and there struck the truck driven by defendant's decedent. Appellee contends that the evidence is insufficient to show that the Marmon car driven by the defendant was at any time until after the actual collision north of the center of the highway, and that the physical facts show that the collision occurred south of the center of the highway. At the time that the accident occurred, the Chevrolet truck driven by decedent was traveling westward behind a Chevrolet sedan in which five students of the Ogden high school were riding. While this Chevrolet sedan was thus traveling about a quarter of a mile just before the accident happened, two of these students, Margaret Smith and Ethel Peters, had been looking backward through the rear window of the sedan at the decedent, with whom they were well acquainted. Margaret Smith was seated on the right-hand side of the front seat, and Ethel Peters was seated on the right-hand side of the rear seat. Margaret Smith testified in substance:

"We were well over the black line that extended down the center of the pavement. We were on the right of that line as we went west. * * *

"Q. With reference to the car length, Miss Smith, I wish you would tell us about how far to the rear of your car Francis Ryan's car was? A. About a car length.

"Q. And as he was driving along there to the rear of your car, can you, or did you observe how he drove his car with reference say to the black line, that extended down the paving? A. He was then well over on his side. * * *

"Q. Then as you observed Francis there to the rear of your car did anything happen? A. Yes, sir.

"Q. What happened? A. He jerked his wheels to the right.

"Q. He jerked his wheels to the right? A. Yes, sir.

"Q. That would be in what direction? A. It would be north.

"Q. And as he jerked his wheels to the right, the north, as was stated, tell the jury in your own way what else happened. A. Just as he did that there was a crash.

"Q. What crash? A. This oncoming car coming from the west going east hit him. * * *

"Q. Now you told us a moment ago that Mr. Ryan just prior to the collision turned his car to the north, now I want to ask you, Miss Smith, at the time the big car we will call it, came from the west and struck the Ryan car, on which side of the black line was the Ryan car? A. On the north side.

"Q. Can you give this jury any idea how far it was on the north side? A. Possibly a foot over the line.

"Q. As you observed it, the Ryan car from a point about the Christianson home, did the Ryan car at any time go over to the south side of that black line? A. No, sir.

"Q. Now the car in which you were riding was being driven you say, to the north of the black line? A. Yes, sir.

"Q. Where was the Ryan car with reference to being behind your car? A. It was directly behind it."

Ethel Peters testified in substance:

"Leland was driving his sedan on the north side of the road and Francis was driving his car with reference to the one in which I was riding directly behind us and as I observed him there in the rear of our car he was directly behind us and followed behind for some distance. * * * In telling the jury in my own words what I saw from the first I observed him up to the time of the collision when he was driving behind our car, what happened from the time I first saw him when I waved at him through the window up to the time when the collision occurred, Francis was following us just behind as we were going along and I was looking out the back window. * * * At the time the Marmon car struck the Ryan truck the Ryan truck was going west. It was east of our rear end directly behind us. I should say about a car or car and a half.

"Q. Well, do you know where they came together with refer-

ence to the center of the Highway? A. Yes, sir, it was north of the center.

"Q. Did Francis Ryan at any time as you observed him there attempt, after you first saw him over near the Christianson place, attempt to pass your car? A. No, sir.

"Q. Then from the time that you first saw him up to the time that the cars came together, on which side of the center of that paved Highway was Francis driving the Chevrolet delivery truck? A. On the north side. * * * We were driving on the north side. We were driving on the north side and well over. I couldn't say how close, I wasn't looking. The other car was right behind us in the same line. I was noticing that, I don't think our car was any further over to the north side than his car that was behind us. I will not say where the car was immediately behind with reference to the north side of the pavement. It was not over to the south side over the middle line to the south. It wasn't up on the gravel either. It wasn't on the south side. It was in between but to say definitely just how many feet I don't know. In giving the jury my best judgment as to how far this car, I say that it was immediately behind us and well over on the north side. As to how far it was from the extreme north edge of that pavement it might have been a foot and it might not, that I do not know. I did say that in a general way my best judgment is it was probably traveling within a foot of the north edge, more or less. I do not mean a good many feet less or a good many feet more. I wouldn't say anything definitely that it was traveling one foot from the north edge as being reasonably accurate as I place the north edge of the car as it went west. * * * It was directly behind us when it was hit by this other car. When I say that the Marmon car, that I saw the actual contact—it happened in such a flash I don't remember exactly where that car was.

"Q. As I understand it your testimony now is to the jury that when the two cars contacted and struck, you don't tell the jury that the Marmon car was north of the black line or wasn't north because it happened so quickly you couldn't tell. A. I think the Marmon car was north of the black line.

"Q. You say you think, Miss Peters. Do you mean that was your judgment or were you just guessing at it? A. That was my judgment.

"Q. You have it now at the time of the contact in your judgment

the Marmon car hit the other car when it, the Marmon car, was north of the black line? A. Yes, sir.

"Q. And it knocked it 50 feet to your actual best judgment? A. Yes, sir.

"Q. You told us in your best judgment the car of Ryan's was following in line with your car a foot from the north edge. Was it there when it was hit, about a foot from the north edge? A. I cannot say how far it was from the north edge, it was directly behind us. To be truthful about it while I said it was following us within about a foot of the north edge, I don't know. As to the distance the Ryan car was back of us at the time I said it was only about a foot from the north edge, it is my best judgment it was back of us about a car or a length and a half at the time of actual contact and at that time it was still on the north side of the paving and in line with our car. At the time of the contact the car was about a car length or a length and a half back of us and was reasonably close also to the north edge of the pavement and it was hit and knocked 50 feet east and north. It was not knocked many feet north because part of it was still on the pavement. When it hit this car, the front end of the Marmon turned to the northeast. In the question you assume that this is the extreme north edge of the pavement going west in our direction. We were in the car well over on the north side near the paving and back of us was the Ryan car exactly in line or about in line with our car going west and as I looked out the back window it was going in a straight line, that is my best judgment. * * * During that quarter of a mile I was not looking at the car part of the time. I was looking at Francis. His car at no time attempted to go out around our car. I am sure of that. He was going straight west on the north side of the pavement near the north edge all the time, and the other car just contacted it at the time it was going straight north near the north edge of the pavement."

Appellee argues that the testimony of Leland Keel, the driver of the Chevrolet sedan which was traveling ahead of the Ryan truck, and of M. A. Pett, a garage man, coupled with the physical facts, show that the accident could not have occurred north of the center line of the highway. Leland Keel is the only one of the witnesses who testified to having seen the Amodeo car at any time before the accident. He was the driver of the Chevrolet car and saw the Amodeo car as it approached him from the west, and testified that it was on its own side of the road as it passed his car. The witness M. A.

Pett testified to skid marks on the pavement which began about three feet from the center line and curved for a distance of about six feet toward the black center line of the highway, where they ended. He also testified on cross-examination as to how a car with four-wheel brakes would act if the brakes were not evenly adjusted. It seems to be the argument of appellee that the testimony of Keel and Pett, together with the skid marks, absolutely contradicts the testimony of Miss Smith and Miss Peters. Appellee, apparently, argues that, because the Marmon car was on the south side of the road as it approached and passed the Chevrolet sedan driven by Keel, it was, therefore, impossible for it to be on the north side of the road at the distance back of the Keel car where the accident happened, and that, because the skid marks ended at the black line, it was, therefore, impossible that the Marmon car should have been beyond the black line and thus have caused the accident.

Miss Smith placed the distance of the Ryan truck behind the Chevrolet sedan at about a car length, while Miss Peters stated that it was probably a car length or a car length and a half. Miss Peters also estimated the length of a car at from twelve to fifteen feet. All of these statements were mere estimates, as to which some latitude might reasonably be allowed, while the statements made by both of these witnesses as to where the Ryan truck was with reference to the black center line on the pavement were positive statements. In view of the well-recognized rule that the evidence must be considered in its most favorable aspect for the party against whom a motion for a directed verdict is made, it is somewhat difficult to understand appellee's contention that the Ryan truck was from six to twelve feet behind the sedan in which these two witnesses were riding. Even if the Ryan truck were no more than a car length or a car length and a half behind the Chevrolet sedan, we see no physical impossibility in the Marmon car passing the Chevrolet sedan in safety and still reaching the north side of the pavement where it struck the Ryan truck; and, even though the fact that the skid marks went no further than the center line of the pavement should be taken as indicating that the wheels of the Marmon car did not travel any further northward than the center line of the pavement, we fail to see how this is proof positive that no part of the Marmon car could have projected beyond the center line of the pavement and come in contact with the Ryan truck to the north thereof. It is not at all impossible that the wheels of the Marmon car may have traveled fur-

ther northward than the skid marks indicate, because it is entirely possible that the brakes may have been released at that point. Moreover, if these skid marks prove anything positively, they prove that the defendant's car did turn to the northeastward after it had passed the Chevrolet sedan and traveled in that direction at least as far as the center line of the pavement, thus negativing the argument that, because it was on the south side when it passed the Chevrolet sedan, it was impossible for it to reach the north side when it came into contact with the Ryan truck.

Appellee also places great stress on the fact that the witnesses Miss Smith and Miss Peters testified that the Ryan truck when struck was driven eastward and northward, and argues that the positions of the cars when they came to rest show that, if this be true, the accident could not have occurred on the north side of the center line of the highway. Not only these two witnesses, but other witnesses, testified that, when the cars came to rest the Ryan truck was approximately fifty feet east of where the collision occurred and that the Marmon sedan was about fifteen feet east of it; that the Ryan truck was facing southwesterly with its rear wheels on the north edge of the pavement and the shoulder of the road and the left front wheel near the center line; that the Marmon car was facing northeastward with the left front wheel about one foot north of the center line. To require witnesses to state exactly and in detail all the movements of two automobiles during the extremely brief period of time involved in a collision is to require something which experience in the trial of automobile collision cases shows to be impossible. And so to say that the impressions of witnesses as to some particular thing that occurred during such brief interval should be given more weight than their positive statements as to the position of one of the automobiles with reference to a fixed object up to the moment of the collision is an unwarranted invasion of the province of the jury. When a court undertakes to determine just how automobiles must have acted in the case of a collision, it is entering the realm of speculation instead of dealing with clearly established and unmistakable physical facts. The positions of the Ryan truck and of the defendant's car after they came to rest cannot, as a matter of law, be said to make it physically impossible that the collision could have occurred to the north of the center line of the highway. Nor do the positions of these cars after they came to rest necessarily contradict the testimony of the witnesses Miss Smith and Miss Peters. The

762

testimony shows that the driver of the Ryan truck jerked his wheels to the right, and that, just as he did so, there was a crash. If the driver of the truck succeeded in turning his wheels to the right, his truck was headed in a northwesterly direction, and if the Marmon car traveling northeasterly struck the truck a glancing blow about even with the door, as testified to by the witnesses, this might easily have a tendency to drive the truck backward along the pavement while still in contact with the Marmon car, and as the Marmon car proceeded pushing the truck backward, it is not at all inconceivable that the force of the blow and the momentum of the Marmon car may at last have whirled the rear end of the truck to the northeastward and whirled the Marmon car so that it was facing northeast with its front wheels across the center line of the pavement.

We do not feel that there is anything in the physical facts or in the statements made by the witnesses Keel and Pett which necessarily leads to the conclusion that the Marmon car and the Ryan truck did not collide north of the center line of the pavement, and, taking into consideration the positive statements of Miss Smith and Miss Peters as to the position of the Ryan truck prior to and at the moment of the collision, we are constrained to hold that the trial court erred in finding that there was not sufficient evidence of negligence upon which to submit the case to a jury.

For the reasons given, therefore, the cause is hereby reversed.

ALBERT, C. J., and STEVENS, KINDIG, CLAUSSEN, MITCHELL, ANDERSON, and KINTZINGER, JJ., concur.